UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Norfolk Division)

| | |
|---|---|
| TOM ENDRES, LATONYA FIELDS, and LAURA METZ, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> JACKSON HEWITT, INC., JACKSON HEWITT TAX SERVICE INC., and TAX SERVICES OF AMERICA, INC. <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No.   2:19-cv-00037-HCM-LRL |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Tom Endres, Latonya Fields, and Laura Metz, on behalf of themselves and others similarly situated, for their Complaint against defendants Jackson Hewitt, Inc., Jackson Hewitt Tax Service Inc., and Tax Services of America, Inc. (collectively, "Jackson Hewitt"), allege as follows:

I-1589474.1

## NATURE OF THE CASE

1. This is an antitrust class action brought by and on behalf of individuals who work or have worked for Jackson Hewitt, a tax preparation services company and franchisor, for unlawfully conspiring to suppress the wages of its employees through agreements with its franchisees not to compete for workers in violation of Section 1 of the Sherman Act. Jackson Hewitt orchestrated and enforced this conspiracy at least in part through an explicit contractual prohibition ("No-Poach Clause") contained in standard Jackson Hewitt franchise agreements that severely limited Plaintiffs' and Class members' job mobility and served to significantly suppress their compensation.

## JURISDICTION AND VENUE

2. Plaintiffs bring this action to obtain injunctive relief and recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3. The Court has subject matter jurisdiction under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), and 28 U.S.C. §§ 1331 and 1337.

4. All Jackson Hewitt defendants conduct business in this District and thus are subject to personal jurisdiction in this Court.

5. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, as well as 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiffs' claims alleged herein occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and Defendants reside in, can be found in, and/or transact business in this District.

I-1589474.1

## THE PARTIES

6.    Plaintiff Tom Endres is a citizen of Illinois who resides in Maquon, Illinois.  Plaintiff Endres worked as a seasonal Tax Preparer I at Jackson Hewitt's Kewanee, Illinois location from 2016 through 2018. As a result of the conspiracy described herein, Plaintiff Endres's compensation was suppressed during the time he worked for Jackson Hewitt.

7.    Plaintiff Latonya Fields is a citizen of Mississippi who resides in Jackson, Mississippi. Plaintiff Fields worked as a seasonal Tax Preparer I at Jackson Hewitt's Vicksburg, Mississippi location during 2015 through 2016. As a result of the conspiracy described herein, Plaintiff Fields's compensation was suppressed during the time she worked for Jackson Hewitt.

8.    Plaintiff Laura Metz is a citizen of Virginia who resides in Virginia Beach, Virginia. Plaintiff Metz worked as a tax preparer and supervisor at Jackson Hewitt's Norfolk and Virginia Beach, Virginia locations from 2007 through 2013. As a result of the conspiracy described herein, Plaintiff Metz's compensation was suppressed during the time she worked for Jackson Hewitt.

9.    Defendant Jackson Hewitt, Inc., is a Virginia corporation with headquarters at 10 Exchange Place, 27th Floor, Jersey City, New Jersey 07302.

10. Defendant Jackson Hewitt Tax Service Inc. is a Delaware corporation. It is also headquartered at 10 Exchange Place, 27th Floor, Jersey City, New Jersey 07302.

11. Defendant Tax Services of America, Inc. is a Delaware corporation. It is also headquartered at 10 Exchange Place, 27th Floor, Jersey City, New Jersey 07302.

12. Jackson Hewitt franchisees, as well as direct and indirect subsidiaries of defendant Jackson Hewitt Tax Service Inc. that operate company-owned stores, have participated as co-conspirators with Jackson Hewitt in the offenses alleged in this Complaint, and have performed

3

acts and made statements in furtherance of the conspiracy, or in furtherance of the anticompetitive conduct.

13. Reference to any act, deed or transaction of any corporation or limited liability entity means that the entity engaged in the act, deed or transaction through its officers, directors, agents, employees or representatives while actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

## FACTUAL ALLEGATIONS

14. Throughout the Class Period, Jackson Hewitt and co-conspirators employed Class members throughout the United States.

15. Jackson Hewitt's conduct substantially affected interstate commerce, and caused antitrust injury, throughout the United States.

16. Jackson Hewitt holds itself out as an, "industry leading provider of full-service individual, federal, and state income tax preparation with offices all across the country." https://www.jacksonhewitt.com/careers/ (last visited Dec. 14, 2018).

17. Jackson Hewitt states it has been a, "trusted tax advisory for over 35 years, helping millions of hardworking people just like you get the most out of their taxes." https://www.jacksonhewitt.com/ (last visited Dec. 14, 2018).

18. Individuals can make an appointment with a tax preparer at a physical office, can access the assistance of a "tax pro" remotely, and can download tax filing software via desktop and mobile applications.

19. Jackson Hewitt provides in-person tax preparation services at approximately 6,000 offices across the United States, including 3,000 in Walmart stores. As of 2018, approximately

4

4,000 of its locations are franchise-owned while the remaining approximately 1,800 of its U.S. offices are corporate-owned.

20. Jackson Hewitt boasts that it employs "over 25,000 Tax Pros who know taxes and tax reform inside and out." https://www.jacksonhewitt.com/ (last visited Dec. 14, 2018).

21. Tax preparation personnel, like personnel in any labor market, benefit when their employers compete for their services. Competition in the labor market creates leverage for personnel, which in turn leads to higher wages and greater mobility.

22. Beginning at least by 2003 and continuing through the present, Jackson Hewitt, along with other unnamed co-conspirators, enacted a scheme related to the recruitment of employees and potential employees, which included policies and agreements not to solicit or recruit without prior approval of each other's personnel.

23. The standard franchise agreement between Jackson Hewitt and its franchisees during the Class Period includes a "Restrictions on Competition" clause that states:

> During the Term and for a period of two (2) years after the earlier of (1) the effective date of termination for any reason, or (2) expiration of this Agreement, or (3) the date of the sale of the Franchised Businesses or a majority of its assets, neither you nor any of your Owners may, without our prior written permission, during the below-mentioned employees' employment with us or our Affiliates, as applicable, and for a period of one (1) year after they leave such employment, solicit, recruit, or hire, for a job position entailing tax preparation, tax preparation management or supervisory duties, or tax preparation instruction duties, within the boundaries of any Territory, which you own or owned within the one (1) year prior to such earlier date, any of our Affiliates' employees whose duties with us or our Affiliates include(d) management of or over company-owned or franchised stores, franchisee training, tax preparation software writing or debugging, tax return processing software writing or debugging, electronic filing of tax returns, tax return processing, processing support, tax return preparation, or tax return preparation advice or support.

24. According to Duane Mora, SVP of franchise relations & development, to "protect existing franchisees from having their best tax preparers hired away from them…" a fee equal to

three times the annual salary of the hired employee is charged to any franchisee who hires a Jackson Hewitt corporate or franchise employee as a "disincentive for new franchisees." Julie Bennett, *Switches at top for Jackson Hewitt*, May 23, 2017, available at https://www.franchisetimes.com/June-July-2017/Switches-at-top-for-Jackson-Hewitt/.

25. The purpose and effect of this scheme was to limit and suppress mobility and compensation for Class members.

26. These agreements impeded or restricted the movement of employees between Jackson Hewitt and its franchisees, thereby suppressing competition between and among Jackson Hewitt and its franchisees for employees. The agreements unreasonably limited franchisees' ability to solicit employees who work for Jackson Hewitt or other franchisees, reducing the pool of experienced candidates available to them and decreasing the employment options available to current employees. Basic economic principles inform that a reduction in the pool of potential employers tends to lower the bargaining power of employees and depress wages, especially if the lost opportunities were superior to their current employment.

**Background on the Jackson Hewitt Franchise Model**

27. Jackson Hewitt was founded in 1982 by John Hewitt. Beginning in approximately 1986, Jackson Hewitt began to franchise tax preparation branches.

28. The franchise program rapidly expanded Jackson Hewitt throughout the United States. Within eleven years of its first franchise agreement, Jackson Hewitt had more than 1,900 offices in at least 37 states.

29. Today, Jackson Hewitt has corporate or franchise locations in nearly every state as well as the District of Columbia and generates over $200 million in annual revenue.

I-1589474.1

30. Jackson Hewitt's major revenue sources include tax preparation fees and related services performed at corporate-owned tax offices, franchise royalties, sales of desktop tax preparation software, and fees from related services and products.

**Jackson Hewitt's Franchise Model**

31. Jackson Hewitt receives profits from its franchises primarily through charging royalties on the franchises' gross revenue.

32. Jackson Hewitt franchises throughout the United States operate on standardized terms pursuant to a common franchise agreement. Jackson Hewitt reserves rights to compete with the franchise locations and does not guarantee other locations will not be competitors. As such, Jackson Hewitt franchises are competitors with Jackson Hewitt and with each other.

33. As stated in Jackson Hewitt's Form Franchise Agreement ("FFA"), Jackson Hewitt franchisees function in an "independent contractor" relationship with Jackson Hewitt. The franchise agreement states that "no principal-agent, partnership, employment, joint venture or fiduciary relation exists between you [Franchisee] and us [Jackson Hewitt]." In fact, the FFA specifically requires that franchisees hold themselves out as "independently owned and operated."

34. The FFA further spells out that, as between the franchisee and Jackson Hewitt, "[y]ou [franchisee] are solely liable for any taxes levied on you, utility obligations, contractual and other obligations. You are not authorized to make any contract, warranty or representation, or incur any obligation on our behalf."

35. The FFA expressly states that Jackson Hewitt, including its corporate-owned locations and "Affiliates" may: "engage in any and all activities that we (and they) deem appropriate and

that are not expressly prohibited under this Agreement, wherever and whenever we (and they) desire, and whether or not such activities compete with your Franchised Business."

36. Moreover, Jackson Hewitt's Franchise Disclosure Document ("FDD"), which summarizes the franchise agreement in "plain English," states that, "your Territory will not be entirely exclusive, and, as a result, you may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control."

37. Indeed, the FDD provides that Jackson Hewitt may, "offer and distribute and/or license or sublicense others to offer and distribute an online tax preparation software or service to customers for the preparation of individual income tax returns using the name "Jackson Hewitt" and the Marks or any other trademarks or service marks."

38. Further, the FFA states that if Jackson Hewitt can "secure the opportunity to operate an Affinity Location or National Account Location in the Territory...the Affinity Account or National Account does not insist, at any time, that it, we or our Affiliates operate the location and permits us to allow our franchisees to operate at such locations, and (c) you are in compliance with all of your obligations under this Agreement and all Collateral Agreements, we may offer you this opportunity....." If specified conditions and procedures are not met, then "we [Jackson Hewitt], our Affiliate, another franchisee, or a third-party we license (including the Affinity Account at the Affinity Location or National Account itself) may provide the services and operate a Jackson Hewitt Business at the Affinity Location or national Account Location."

39. Jackson Hewitt's FFA states that all decisions related to employment are to be made entirely and independently by each franchisee. Further, it states that employees of the franchisee are not employees of Jackson Hewitt:

I-1589474.1

Since you are an independent contractor, you have the sole right to control all aspects of your relationships with your employees and prospective employees, including all decisions regarding hiring, firing, training, supervision, discipline, scheduling (including if you use any scheduling modules we provide to you ) and compensation (paying wages and withholding and paying taxes) in respect of your employees…Neither you, nor your manager or your employees shall be considered or represented as our employees or agents.

40. Thus, as Jackson Hewitt's FFA and FDD make clear, Jackson Hewitt franchise locations do and are intended to compete with each other as well as with Jackson Hewitt corporate-owned locations. Each franchisee independently owns and operates its franchise location(s) as such. Among other things, such franchisees possess and exercise sole and complete decision-making authority as to all employment-related decisions, including, but not limited to, recruitment, hiring, firing, advancement, promotion, staffing, compensation, conditions of employment, discipline and other day-to-day management of employees. The only restriction placed on the franchisees is to not compete over the labor pool.

41. But for the conspiracy, and the conduct of Jackson Hewitt and its agents and co-conspirators in furtherance thereof, each Jackson Hewitt franchisee would have competed with other Jackson Hewitt franchisees and with Jackson Hewitt itself for employees and would have engaged in competition and would have solicited and recruited employees from other Jackson Hewitt franchisees and from Jackson Hewitt corporate-owned locations.

**The No-Poach Agreements between and among Competing Jackson Hewitt Locations**

42. Notwithstanding the FFA's definition of the franchisor-franchisee relationship, Jackson Hewitt and its franchises have agreed not to compete with respect to recruitment and other aspects of competition with respect to the soliciting and recruiting of employees.

43. Specifically, since at least 2003, Jackson Hewitt's franchise agreement, which franchisees are required to sign, included a clause prohibiting any Jackson Hewitt franchise from

hiring any employees of Jackson Hewitt, including its corporate-owned tax offices, or employees of other Jackson Hewitt franchises. This clause (the "No-Poach Clause") provides:

> During the Term and for a period of two (2) years… neither you nor any of your Owners may, without our prior written permission … solicit, recruit, or hire….any of our or our Affiliates' employees whose duties with us or our Affiliates include(d) management of or over company-owned or franchised stores…electronic filing of tax returns, tax return processing, processing support, tax return preparation, or tax return preparation advice or support.

44. Moreover, from approximately 2015 until July 2018, the FFA included a "Recruiting Fee" in connection with the No-Poach Clause. As described in the FDD, the fee was "300% of the annual salary of person recruited or hired." In "plain English," this fee is applicable:

> Only if you recruit or hire any person then employed, or who was employed within the immediately preceding 24 months by us, any of our Affiliates, or a Jackson Hewitt franchise owner, or any of our or our Affiliates' officers or directors.

45. The anti-poaching scheme was between and among separate economic actors pursuing separate economic interests such that the agreement deprives the marketplace generally and the Class members specifically of the benefits of independent centers of decision-making as well as the benefits of free and open competition.

46. The No-Poach Clause was not intended or limited to simply protecting Jackson Hewitt's investment in training its employees at corporate-owned offices. After all, the franchise offices' employees were required to meet the same training requirements.

47. The only purpose of the no-poaching restriction was to restrict competition for employees in the market and artificially suppress wages among competing firms in a highly specialized sector.

I-1589474.1

**Employee Recruitment, Hiring, and Training**

48. As the second largest provider of tax preparation services in the United States, Jackson Hewitt and its franchisees have a critical need for workers trained not only in tax preparation and assistance but also in Jackson Hewitt's System.

49. Jackson Hewitt boasts over 25,000 "trained Tax Pros."

50. Due to the seasonal nature of tax preparation, Jackson Hewitt and its franchisees must recruit and hire a large number of new or returning employees every year.

51. As Jackson Hewitt highlights in its job postings, "[w]e recognize and appreciate that our team members are our single greatest competitive advantage." *See, e.g.,* https://usr55.dayforcehcm.com/CandidatePortal/en-US/jhewitt/Posting/View/14242 (last accessed Dec. 15, 2018).

52. As Jackson Hewitt recognizes in its job postings, the regular need each tax season for qualified tax preparation workers would otherwise lead to healthy competition between Jackson Hewitt, its franchise locations, and other companies providing tax preparation services, and thus, higher wages, benefits, compensation and other terms of employment. Instead, as part of its efforts to keep its "single greatest competitive advantage," Jackson Hewitt conspired with its franchisees and other co-conspirators to restrict employee mobility and competition in the market, with the purpose and effect of reducing and restricting mobility and limiting and reducing wages, benefits, compensation and other terms of employment.

**Required Training Specific to Employment at Jackson Hewitt and Its Franchises**

53. Each Jackson Hewitt tax professional must invest dozens of hours to complete Jackson Hewitt specific educational requirements before even being considered for employment at

11

Jackson Hewitt or its franchises, unless he or she passes a test to demonstrate equivalent knowledge. Completing those requirements provides no guarantee of employment.

54. To meet the need for the large number of tax professionals required to staff the company's many corporate and franchise office locations, Jackson Hewitt established the "Jackson Hewitt Basic Tax Preparation Course" to provide introductory income tax courses to individuals with no background in tax return services as well as supplemental courses for more experienced tax professionals. Today, the "Jackson Hewitt Basic Tax Preparation Course" provides approximately 70 hours of instruction relating to tax forms. Classes are typically held at local Jackson Hewitt offices, with additional sessions provided online.

55. To apply for a job with Jackson Hewitt or one of its franchises, a prospective employee must either take the "Jackson Hewitt Basic Tax Preparation Course" or pass a test to demonstrate equivalent knowledge. The course requirement is not considered training, as Jackson Hewitt will not even consider an application until a prospective employee fulfills the course requirement or passes an equivalent knowledge test. Rather, completion of the course is a prerequisite to being considered for employment.

56. Instead, Jackson Hewitt's marketing materials advertise that the "Jackson Hewitt Basic Tax Preparation Course" helps individuals "learn a valuable skill set" and "start a rewarding, fulfilling career as a tax preparer." Completion of the course does not guarantee employment at Jackson Hewitt.

57. Upon successful completion, Jackson Hewitt Basic Tax Preparation Course students receive a Jackson Hewitt Certification. This Certification is a prerequisite for most if not all tax preparation jobs at Jackson Hewitt corporate or franchise locations.

I-1589474.1

58. In addition, seasonal tax preparation workers may be required to complete additional training before they can be considered for rehire in a subsequent tax season.

59. The Jackson Hewitt specific education requirements are the primary qualifications for open tax professional positions at corporate-owned and franchise offices.

60. Due to the hundreds of hours invested in Jackson Hewitt specific training, tax professionals at Jackson Hewitt corporate-owned and franchise locations are uniquely suited to working at Jackson Hewitt or one of its franchise locations, and thus, should generally be highly mobile between Jackson Hewitt corporate and franchise offices.

61. In the absence of Jackson Hewitt's anticompetitive conduct, competition between and among Defendants and co-conspirators for Jackson Hewitt trained workers in the highly specialized and technical tax preparation services industry, particularly within the Jackson Hewitt system, would be robust and would have increased and enhanced the workers' compensation and mobility.

**The Jackson Hewitt System**

62. In addition to the specialized training for tax preparers, management-level employees must complete further specialized training on the Jackson Hewitt System for establishing and operating tax return preparation businesses and performing related services. According to its FDD, the Jackson Hewitt System is provided to "introduce you to Jackson Hewitt Tax Service business."

63. Both corporate-owned and franchise offices and their employees must operate according to the Jackson Hewitt System.

64. To ensure familiarity and compliance with the distinctive Jackson Hewitt System, franchisees, or a management-level employee if the franchisee does not actively manage the

13

business, must attend training on the System before their first tax season. Under the FFA, the franchisee is responsible for the travel expenses, room and board, any fees Jackson Hewitt may impose, and wages for the training. These initial and other ongoing trainings cover topics including, franchisor/franchisee commitments, financial products compliance, client experience, and the Jackson Hewitt service model.

65. As a result of the Jackson Hewitt specific training, education, and qualification requirements, including on Jackson Hewitt's proprietary processes, procedures, methods, and software, like Jackson Hewitt's Basic Tax Preparation Course, employment with a non-Jackson Hewitt tax preparation company or business is not a reasonable and/or complete substitute for the employees of Jackson Hewitt and its franchises.

**The Purpose and Effect of this Scheme was to Restrict Mobility and Suppress Compensation**

### *Restricted and Reduced Mobility*

66. Jackson Hewitt's anticompetitive scheme has restricted and reduced mobility between Jackson Hewitt corporate-owned and franchise locations.

67. The Jackson Hewitt website provides information about more than 25,000 tax professionals working at corporate-owned or franchise offices. Tax professionals with differing degrees of seniority and training carry different titles, including Tax Preparer I, Tax Preparer II, and Tax Preparer III.

68. These agreements and policies eliminate incentives and abilities of franchisees and corporate-owned offices to compete for employees.

69. The scheme restricted employees' mobility by decreasing the pool of potential employers and eliminating competition. This, in turn, has led to suppressed wages, compensation and other benefits, compounded over the long term of the conspiracy.

I-1589474.1

70. The anticompetitive agreement and its harmful effects were not limited to tax professionals but extended to managers and other tax employees of Jackson Hewitt.

*Suppressed Compensation*

71. Jackson Hewitt and franchisee employees have roles in tax preparation, customer service, and administrative or management positions. For each of these roles, employees at Jackson Hewitt and its franchises are paid below the national salary for similar job titles.

72. For example, when estimating the annual expenses for a franchisee, Jackson Hewitt's FDD estimates the cost of a tax return preparer at $8.50 per hour, while the Bureau of Labor Statistics ("BLS") hourly mean wage for a tax preparer is $22.67 per hour. Similarly, according to Duana Mora, SVP of franchise relations & development, the "average corporate tax preparer is making $14 to $20 an hour, including bonuses." Julie Bennett, *Switches at top for Jackson Hewitt*, May 23, 2017, available at https://www.franchisetimes.com/June-July-2017/Switches-at-top-for-Jackson-Hewitt/.

73. But for the conspiracy, employee compensation at Jackson Hewitt corporate-owned and franchise offices would be significantly higher.

## Illegality and Anticompetitive Harm of Franchise No-Poach Agreements

74. On or about July 9, 2018, the Attorneys General of 10 states and of the District of Columbia announced an investigation into the anticompetitive hiring and recruiting practices and procedures used by several large franchise companies, and stated that:

> [W]e are concerned about the use of No Poach Agreements among franchisees and the harmful impact that such agreements may have on employees in our States and our state economies generally. By limiting potential job opportunities, these agreements may restrict employees' ability to improve their earning potential and the economic security of their families. These provisions also deprive other franchisees of the opportunity to benefit from the skills of workers covered by a No Poach Agreement whom they would otherwise wish to hire.

15

I-1589474.1

When taken in the aggregate and replicated across our States, the economic consequences of these restrictions may be significant.

75. Within weeks of the announcement of the States' investigation, Jackson Hewitt released its updated FDD. The updated disclosures eliminated the express fee of three (3) times the annual salary of an existing franchise or corporate employee, however, Jackson Hewitt did not eliminate the No-Poach Clause in its FFA.

76. Further, Jackson Hewitt has not agreed to end its practice of including and enforcing No-Poach Clause in franchise contracts.

### CO-CONSPIRATORS AND AGENTS

77. The anticompetitive and unlawful acts alleged against Jackson Hewitt were authorized, ordered or performed by Jackson Hewitt and its respective directors, officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Jackson Hewitt's businesses or affairs.

78. Individuals and/or entities not named as defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

79. Each Defendant acted as the principal, agent, or joint venturer of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein. The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed between the Jackson Hewitt principals and agents.

80. Accordingly, Jackson Hewitt's principals are liable for the acts of their agents. Likewise, the Jackson Hewitt agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied or apparent authority.

## CLASS ACTION ALLEGATIONS

81. Plaintiffs brings this action on behalf of themselves and all others similarly situated ("the Class") under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3). The Class is defined as follows:

> All persons who worked at any Jackson Hewitt tax office in the United States, whether owned and operated by Jackson Hewitt or by a franchisee, at any time between 2003 and the present.

Excluded from the Class are senior executives and personnel in the human resources and recruiting departments of Jackson Hewitt or co-conspirators and their wholly-owned subsidiaries, as well as personnel hired outside of the United States to work outside of the United States.

82. Based on the nature of commerce involved, as well as the scope and duration of the conspiracy, there are thousands of Class members geographically dispersed across the United States. Therefore, joinder of all members of the Class is impracticable.

83. The questions of law or fact common to the Class include, but are not limited to:

    a.  whether the agreement violated the Sherman Act;

    b.  whether the scheme and No Poach Clause, or any one of them, constitute a per se violation of the Sherman Act;

    c.  whether the scheme and associated agreements restrained trade, commerce, or competition for labor;

    d.  whether Plaintiffs and the Class suffered antitrust injury or were threatened with injury; and

    e.  the type and measure of damages suffered by Plaintiffs and the Class.

84. These and other questions of law and fact common to the Class predominate over any questions affecting only individual Class members.

85. Plaintiffs' claims are typical of the claims of the Class.

17

J-1589474.1

86. Plaintiffs will fairly and adequately represent the interests of the Class and have no conflict with the interests of the Class.

87. Plaintiffs have retained competent counsel experienced in antitrust litigation to represent themselves and the Class.

88. Jackson Hewitt and the co-conspirators have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class.

89. A class action is superior to alternative means of adjudicating this controversy because it will eliminate repetitive litigation and because prosecuting separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Jackson Hewitt.

<strong>ANTICOMPETITIVE EFFECTS</strong>

90. The anticompetitive agreement by and between Jackson Hewitt and its franchisees reduced competition for labor. Jackson Hewitt and the co-conspirators entered into, implemented and policed these agreements with knowledge of the overall conspiracy, and did so with the intent and effect of fixing, retraining and stabilizing the compensation paid to its personnel at artificially low levels.

91. The harm not only reached individuals who sought to change their employment from one franchise or corporate office location to another, but also extended to those who had no intention of changing from one franchise or corporate office location to another, due to, *inter alia*, the companies' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency.

92. While the scheme constitutes a *per se* violation of the Sherman Act, Jackson Hewitt and unnamed co-conspirators also exploited their collective market power in the relevant market,

18

which is the labor market for tax professionals and managers at Jackson Hewitt, as defined herein, in the United States.

93. Through the conspiracy, Jackson Hewitt exercised and maintained this power, and in fact suppressed wages, benefits, and other aspects of pay by eliminating competition.

94. The scheme and the conduct of Jackson Hewitt and its co-conspirators in furtherance thereof did not have, and were not intended to have, procompetitive effects.

95. Alternatively, Jackson Hewitt is liable under a "quick look" analysis where one with even a rudimentary understanding of economics could conclude that the No Poach agreements would have an anticompetitive effect on Class members and markets.

96. Alternatively, any procompetitive effects from the scheme and/or the conduct of Jackson Hewitt and its co-conspirators in furtherance thereof were and are outweighed by the anticompetitive harm alleged herein, including but not limited to restricting employee mobility and suppressing wages, benefits, and other aspects of pay.

### EQUITABLE TOLLING AND STATUTE OF LIMITATIONS

97. While Plaintiffs had knowledge of aspects of Jackson Hewitt's and industry recruiting practices, Plaintiffs had neither actual nor constructive knowledge of Jackson Hewitt's unlawful conspiracy. Nor did Plaintiffs have any reason to suspect that Jackson Hewitt was illegally acting in concert to suppress wages and the labor market. At no point did Jackson Hewitt inform Plaintiffs that its compensation was not competitive but was instead suppressed by Jackson Hewitt's anticompetitive agreements. Plaintiffs therefore did not know of, did not discover, and could not have discovered through reasonable diligence, the existence of the conspiracy outlined in the foregoing allegations.

I-1589474.1

98. Conspiracies, by their nature, must be concealed. To keep the scheme hidden from employees and prospective employees, Jackson Hewitt and its co-conspirators did not publicize the No-Poach Clause. Jackson Hewitt also did not inform employees of the scheme between Jackson Hewitt and its franchises at any time.

99. Jackson Hewitt concealed the conspiracy by giving false and pretextual explanations for hiring and compensation decisions, including that the decisions were based on merit, the operation of free and open competition, and other considerations.

100.   As a result of Jackson Hewitt's and its co-conspirators' successful efforts to conceal the fact and scope of the conspiracy, the running of any applicable statute of limitations has been tolled with respect to Plaintiffs' claims concerning Jackson Hewitt's conspiracy on behalf of the Class.

### COUNT I: VIOLATIONS OF SECTIONS 1 AND 3 OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 3

101.   Plaintiffs incorporate each allegation above as if set forth herein.

102.   Beginning no later than 2003 and continuing through the present, Jackson Hewitt entered into and engaged in unlawful agreements in restraint of trade and commerce, in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

103.   Jackson Hewitt's agreements have included concerted actions and undertakings among themselves and their co-conspirators with the purpose and effect of: (a) fixing, reducing and stabilizing the wages, benefits and other aspects of compensation of Plaintiffs and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Jackson Hewitt for labor.

I-1589474.1

104.    As a direct and proximate result of Jackson Hewitt's combinations and contracts to restrain trade and eliminate competition for labor, members of the Class have suffered injury and have been deprived of the benefits of free and fair competition on the merits.

105.    The unlawful agreements among Jackson Hewitt and their co-conspirators have had the following effects, among others:

a.   competition among Jackson Hewitt for labor has been suppressed, restrained, and eliminated; and

b.   Plaintiffs and Class members have received lower compensation from Jackson Hewitt than they otherwise would have received in the absence of the anticompetitive agreement and, as a result, have been injured in their property and have suffered damages in an amount subject to proof at trial.

106.    The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or committed by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

107.    Jackson Hewitt's contracts, combinations, and/or conspiracies are *per se* violations of Sections 1 and 3 of the Sherman Act.

108.    Accordingly, Plaintiffs and Class members are entitled to three times their damages caused by Jackson Hewitt's violations of Sections 1 and 3 of the Sherman Act, as well as the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction prohibiting Jackson Hewitt from ever again entering into similar agreements in violation of the antitrust laws.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and the Class, demand a jury trial as to all issues triable by a jury.

I-1589474.1

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and that of the

Class by adjudging and decreeing that:

a.  This action may be maintained as a class action, with Plaintiffs as the designated Class representatives and their counsel as Class counsel;

b.  Jackson Hewitt engaged in a trust, contract, combination, or conspiracy in violation of Sections 1 and 3 of the Sherman Act, and that Plaintiffs and the Class have been damaged and injured in their business and property as a result of this violation;

c.  The alleged combinations and conspiracy are *per se* violations of the Sherman Act;

d.  Jackson Hewitt is enjoined from attempting to enter into, entering into, maintaining, or enforcing any no-poach agreement, or other illegal anticompetitive agreement or understanding, as alleged herein;

e.  Judgment be entered for Plaintiffs and Class members, and against Jackson Hewitt, for three times the amount of damages sustained by Plaintiffs and the Class, as allowed by law;

f.  Plaintiffs and the Class recover pre-judgment and post-judgment interest as permitted by law;

g.  Plaintiffs and the Class recover their costs of suit, including attorneys' fees, as provided by law; and

h.  Plaintiffs and the Class are entitled to such other and further relief as is just and proper under the circumstances.

Dated:  February 11, 2019                Respectfully submitted,

                                        /s/_____
                                        Conrad M. Shumadine
                                        VSB #4325
                                        Counsel for Plaintiff
                                        **Willcox & Savage, P.C.**
                                        440 Monticello Avenue, Suite 2200
                                        Norfolk, VA 23510
                                        Telephone: (757) 628-5500
                                        Fax: (757) 628-5566
                                        cshumadine@wilsav.com

I-1589474.1

Jason S. Hartley
**HARTLEY LLP**
500 West C Street, Suite 1750
San Diego, California 92101
(619) 400-5822
hartley@hartleyllp.com

Richard M. Paul III
Ashlea Schwarz
Laura C. Fellows
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
(816) 984-8100
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

*Counsel for Plaintiffs*